NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2520-13T3

DAVID W. OPDERBECK,

     Plaintiff-Respondent,

v.

MIDLAND PARK BOARD OF EDUCATION,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **August 18, 2015**
>
> **APPELLATE DIVISION**

Argued December 17, 2014 — Decided August 18, 2015

Before Judges Fuentes, Ashrafi, and O'Connor.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8571-13.

Stephen R. Fogarty argued the cause for appellant (Fogarty & Hara, attorneys; Mr. Fogarty, of counsel and on the brief; Amy E. Canning, on the brief).

David W. Opderbeck, respondent, argued the cause pro se.

Carl Tanksley argued the cause for amicus curiae New Jersey School Boards Association (Cynthia J. Jahn, General Counsel, attorney; Ms. Jahn and John J. Burns, on the brief).

Paul E. Griggs argued the cause for amicus curiae New Jersey Association of School Business Officials (Sciarrillo, Cornell, Merlino, McKeever & Osborne, L.L.C., attorneys; Mr. Griggs, of counsel and on the brief; Blake C. Width, on the brief).

Emily B. Goldberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (McCarter & English, LLP, and American Civil Liberties Union of New Jersey Foundation, attorneys; Ms. Goldberg, of counsel and on the brief; Roktim Kaushik, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

The Midland Park Board of Education (Board) appeals from the order of the Law Division permanently enjoining it to "make available to the public, by posting to its public website, no later than forty-eight (48) hours before all . . . meetings, the full agenda for such meetings, if such agenda is posted, including copies of any appendices, attachments, reports, and other documents referred to in the agenda[.]" (Emphasis added). The injunction exempts from this publication requirement documents the Board in good faith believes are "subject to an enumerated privilege, exemption, or the like" under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, or the common law right of access.

Because the issues raised in this appeal involve only questions of law, our review of the Law Division's decision is de novo. Saccone v. Bd. of Trs. of the Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014). After reviewing the record

presented by the parties, we reverse. The mandate imposed on the Board by the Law Division in this injunction is not supported by the "adequate notice" requirements imposed on public bodies by the OPMA. We hold the term "agenda," as used in N.J.S.A. 10:4-8(d), does not impose a legal obligation on public bodies to provide copies of any appendices, attachments, reports, or other documents referred to in their agendas.

Although the issue before us is purely a legal one, a brief recitation of the dominant facts of this case will help contextualize our analysis.

I

Plaintiff David W. Opderbeck is a professor at Seton Hall University School of Law and a resident of the Borough of Midland Park. Over the last twelve years, at least one of his children has attended a public school in Midland Park. Plaintiff and his wife, Susan Opderbeck, attended the May 28, 2013 meeting held by the Board to discuss certain school activities in which their children were involved. Mrs. Opderbeck had obtained the agenda of the meeting from the Board's official website.

The agenda for the May 28, 2013 meeting consisted of ten pages. The first part of the agenda contained a statement claiming "adequate notice" of the meeting had been provided "as

specified in the Open Meeting Act[,]" and specifically mentioned that notices had been sent to "the HERALD-NEWS, RECORD, RIDGEWOOD NEWS, and to the Midland Park Borough Clerk for the 2013 elective year." After roll call of the members present, there were sections for the Board Secretary's Report and approval of the minutes for the meetings held on April 9, 2013 and April 30, 2013. The last item of this part of the agenda was titled, "Superintendent's Report."

The next section was designated, "Open to the Public." This part of the agenda was separated into Sections A through L. The relevant sections here are Section A Personnel, Section B Finance Committee, Section C Curriculum Committee, and Section I Personnel Committee. Only these four sections include references to "attachments" or "appendices" that were not made available to the public as part of the "agenda" posted on the Board's website.

Section A Personnel consists of twenty-seven enumerated items. Ten of these agenda items (37.04 percent) include either the phrase "as per the attached appendix" or "support material attached." The following four items represent a sampling of the total seventeen items listed in Section A Personnel that do not reference an "attachment" or "appendix":

> 3. Approve the reappointment of Dr. Everett Schlam, School Physician, for the 2013-2014

school year. His yearly rate will be $4,500.

4. Approve the non-tenured reappointment of Christopher Swank as the Buildings & Grounds Supervisor for the 2013-2014 school year (salary to be determined).

5. Approve the non-tenured reappointment of Ristem Sela as the Computer Technician for the 2013-2014 school year (salary to be determined).

By contrast, Section A <u>Personnel</u> contains items requesting the Board's approval that refer to information undisclosed to the public and acknowledged only by the phrase, "<u>as per the attached appendix</u>." There are also items proposing that the Board undertake a certain course of action, followed by a reference to a document "<u>which is attached as an appendix</u>." As noted earlier, there are a total of ten agenda items in Section A <u>Personnel</u> that fall into this category. In lieu of listing all ten items, we have opted to list the following four specific items for illustrative purposes only:

9. Approve the tenured reappointment of all Clerks/Secretaries for the 2013-2014 school year, as per the attached appendix.

10. Approve the non-tenured reappointment of all Instructional Aides for the 2013-2014 school year, as per the attached appendix.

11. Approve the reappointment of all non-tenured full-time Custodial/Maintenance personnel for the 2013-2014 school year, as per the attached appendix.

17. Approve the staff appointments for the Extended School Year Program, effective July 1 - 31, 2013, which is attached as an appendix[.]

Section B <u>Finance Committee</u> contains thirteen individually numbered items. Only five items refer to "support material attached" or "an appendix." Two of these items are:

10. Approve the use and rental of the High School and Highland School gyms to Hoop Heaven, sponsored by Midland Park Continuing Education, for Basketball Tournaments to be held on Saturday, June 1, 2013 from 8:00 a.m. — 9:00 p.m. (support material attached).

12. Approve the resolution for equipment financing with Global Strategic LLC, which is attached as an appendix.

Section C <u>Curriculum Committee</u> has a total of five enumerated items. Three items contain a reference to either an attached "appendix" or "support material":

1. Approve the following staff members requesting workshop attendance (support material attached)[.]

4. Approve the recommendation of the Interim Director of Special Services for the special education placements and transportation for the summer of 2013, which is attached as an appendix.

5. Approve the proposed overnight trip for the high school Track Team to compete in the State Championship Meet in Egg Harbor, NJ from May 31 - June 1, 2013 (support material attached).

Section D **Policy Committee** through Section H **Public Relations Committee** did not have anything to report.[1] Section I **Personnel Committee** listed the following item for Board approval: "Approve the following job descriptions for Advisors to Activities and Clubs, which are attached as an appendix[.]" The following list constitutes a representative cross-section of the over forty different clubs and activities listed:

> 7th & 8th Grade Class Advisor
> 9th & 10th Grade Class Advisor
> 11th & 12th Grade Class Advisor
> Art Club Advisor
> Biology Club Advisor
> Biology Team Advisor
> Chemistry Team Advisor
> Chess Club Advisor
> Choral Advisor — Madrigals
> Drama Advisor
> Drama Producer
> French Club Advisor
> Gay-Straight Alliance Advisor
> High School Newspaper — Panthers' Pause

Because the Board makes its agendas available to the public by posting them on its official website, Mrs. Opderbeck contacted the Board's Secretary's Office to request that the attachments and appendices referred to therein be equally electronically available on the Board's website. She was advised, however, that the attachments and appendices indicated

---

[1] The remaining Sections which also did not have anything to report were Section E **Legislative Committee**, Section F **Buildings & Grounds Committee**, Section G **Negotiations Committee**, Section J **Liaison Committee**, and Section K **Old Business**.

A-2520-13T3

in the agenda would not be made available to the public until after the meeting. She was further informed that the only means to obtain these documents was to file a formal written request under OPRA. Mrs. Opderbeck requested that a representative of the Board respond to her concerns via email.

On May 29, 2013, Dr. Marie Cirasella, the Midland Park Superintendent of Schools, wrote an email to Mr. and Mrs. Opderbeck in response to the questions raised by Mrs. Opderbeck "at last night's Board of Education meeting" concerning "overnight field trip proposals for the Syracuse and California band trips." The Superintendent noted that pursuant to Board regulation, overnight field trips "should not be approved until the school calendar has been struck." Due to a number of factors, the Board was unable to finalize the school calendar until April 30, 2013.

Addressing the concerns raised in the public session of the May 28, 2013 Board meeting, the Superintendent informed Mrs. Opderbeck that "[t]he Board cannot and should not rely on information provided by [B]oard meeting attendees during open session — it is the school administration's responsibility and charge to do so." Superintendent Cirasella ended the email by reminding Mrs. Opderbeck that the trip proposals were again placed on the agenda for curriculum committee discussion and

would be brought before the Board for final approval at its meeting scheduled for June 4, 2013.

By email dated May 30, 2013, plaintiff responded to Superintendent Cirasella concerning the Board's refusal to provide the appendices and attachments noted in the agenda as supplementary material to specific items. Citing Board Bylaw 0164,[2] plaintiff advised the Superintendent as follows:

> By withholding from public scrutiny the "reports and supplementary materials" that are part of the "agenda" as defined by BOE By-Law 0164, the Board is not providing notice of the agenda "to the extent known" to the Board, in violation of the Sunshine Law [(OPMA)]. It is a matter of grave concern that the Board would withhold such information from the public absent the limited exceptional procedures specified in [the] Sunshine Law. See N.J.S.A. 10:4-9b. Please confirm that the full agenda, including attachments provided to the Board, hereafter will be supplied to the public in advance of Board meetings.

By letter dated June 3, 2013, the Board's General Counsel informed plaintiff that the Board would not provide agenda attachments to the public prior to the meetings. Relying on an advisory opinion of the New Jersey Attorney General, counsel

---

[2] Bylaw 0164 is titled, "CONDUCT OF BOARD MEETINGS." The relevant section, denoted "Agenda," states: "The Superintendent shall prepare an agenda of items of business to come before the Board at each meeting. The agenda shall be delivered to each Board member no later than Friday before the meeting and shall include such reports and supplementary materials as are appropriate and available." (Emphasis added).

informed plaintiff "the word agenda refers solely to the list of items to be discussed or acted upon at the meeting." The record shows plaintiff and the Board's counsel attempted to reach a compromised position without success.

II

A

The Board argues "there is nothing contained in the OPMA to suggest the Legislature intended to apply anything other than the plain, dictionary meaning to the term agenda." Absent any clear direction from the Legislature, the Board argues we should construe the term "agenda" in N.J.S.A. 10:4-8(d) by its ordinary meaning. Harking back to 1975, the year the Legislature adopted the OPMA, the Board cites the 1975 Webster's New Collegiate Dictionary, which defines "agenda" as "a list, outline, or plan of things to be considered." The Board also cites Black's Law Dictionary 58 (4th rev. ed. 1968), which defines agenda as "memoranda of things to be done, as items of business or discussion to be brought up at a meeting; a program consisting of such items."

Following this approach, the Board urges us to reverse the Law Division's expansive definition of "agenda," and vacate the burdensome injunction which imposes obligations to post on its website supplementary materials never intended to be included

10

within the definition of "adequate notice" in <u>N.J.S.A.</u> 10:4-8(d).[3]

Plaintiff argues that citing "a number of dictionary definitions" in an attempt to ascertain the plain meaning of the term "agenda" "at best beg[s] the question whether a document <u>incorporated by reference</u> into a 'list, outline, or plan' is, in fact, <u>part of</u> the 'list, outline, or plan.'" Citing a number of cases discussing and applying the contract law doctrine of "incorporation by reference,"[4] plaintiff argues the documents

---

[3] The Board also argues its position before us is supported by the Supreme Court's decision in <u>Witt v. Gloucester County Board of Chosen Freeholders</u>, 94 <u>N.J.</u> 422 (1983), and our decision in <u>Crifasi v. Governing Body of Oakland</u>, 156 <u>N.J. Super.</u> 182 (App. Div. 1978). We disagree. Neither one of these opinions addressed the scope or content of an "agenda" under <u>N.J.S.A.</u> 10:4-8(d). In <u>Witt</u>, <u>supra</u>, 94 <u>N.J.</u> at 432, the Supreme Court determined that "a public body that has complied with the annual notice requirements of <u>N.J.S.A.</u> 10:4-18 [need not] also comply with the forty-eight-hour notice requirements of <u>N.J.S.A.</u> 10:4-8(d)." In <u>Crifasi</u>, <u>supra</u>, 156 <u>N.J. Super.</u> at 185-86, we approved the appointment of a replacement member to the Borough Council at a regularly scheduled meeting, despite the fact that the topic had not been included in the meeting's agenda.

[4] By way of example, plaintiff cites <u>Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn</u>, 410 <u>N.J. Super.</u> 510 (App. Div. 2009), <u>certif. denied</u>, 203 <u>N.J.</u> 93 (2010), in support of his argument to apply the contract law doctrine of "incorporation by reference" to the question of statutory construction we confront here. <u>Quinn</u> involves a dispute between an attorney and a client over the terms of a retainer agreement. <u>Id.</u> at 518. As explained by our colleague Judge Lyons, "[u]nder New Jersey law, two or more writings may constitute a single contract even though they do not refer to each other. Whether two writings are to be construed as a single contract, however, depends on the
(continued)

attached by the Board to an agenda "highlights an ambiguity in the statutory language" that should be resolved by this court "liberally" in favor of disclosure under N.J.S.A. 10:4-21.

Amici New Jersey School Boards Association (NJSBA) and New Jersey Association of School Business Officials (NJASBO) both urge us to reverse the Law Division's ruling and adopt the definition of agenda contained in Formal Opinion No. 19-1976, prepared by Deputy Attorney General (DAG) Mary Ann Burgess on June 22, 1976, in response to four specific questions asked by the State Commissioner of Education concerning the then recently adopted OPMA. In question number four, the Commissioner asked: "What is the scope of the term 'agenda' as used in the Open Public Meetings Act?" DAG Burgess noted the Commissioner "specifically ask[ed] whether the term [agenda] may be construed to mean the several sheets of paper which enumerate the items for consideration by the [State] Board, or whether the term must be defined to include all the pages of descriptive materials provided to members of the Board."

DAG Burgess began her analysis by acknowledging "[t]here is no definition of 'agenda' within the [OPMA]." After citing to

(continued)
intent of the parties." Id. at 533 (citation omitted). These principles of contract law are not useful or relevant to the question of statutory construction raised in this appeal.

the meaning of "agenda" in Black's Law Dictionary (4th ed.) and the Webster's Third New International Dictionary (1965), and reviewing the then most recent decisions from this court discussing the canons of statutory interpretation, DAG Burgess concluded there was no indication in the OPMA that the term "agenda" should be accorded any "special meaning." Building on this conclusion, she opined that "[t]he notice required by N.J.S.A. 10:4-8(d) . . . need only contain a listing of the items which will be before the Board at the meeting and need not include the supportive or explanatory materials and reports relative to such items."

Amicus the American Civil Liberties Union of New Jersey (ACLU-NJ) begins its argument by emphasizing our State's long commitment to protecting and strengthening the public's right to access public information. The ACLU-NJ quotes the testimony of Assemblyman Byron M. Baer before the Assembly Judiciary Committee. Assemblyman Baer was the sponsor of the bill that would become the OPMA, and is indisputably recognized as the key voice in the Legislature who advocated for the passage of the legislation officially known as the "Senator Byron M. Baer Open Public Meetings Act." N.J.S.A. 10:4-6.

Assemblyman Baer personally championed the public policies of transparency and access embodied in the OPMA. Despite the

provisions in the statute intended to protect these egalitarian values, the ACLU-NJ claims vague agendas and insufficient notice remain a persistent problem nearly forty years after the enactment of the OPMA. The ACLU-NJ thus urges us to affirm the Law Division's expansive view of "agenda" as a means of fulfilling the OPMA's promise of requiring transparency in the way public bodies transact the public's business.

B

We begin our analysis by acknowledging that the overarching public policy that drives the OPMA is "'the right of [a] citizen[] to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way.'" McGovern v. Rutgers, 211 N.J. 94, 99 (2012) (quoting N.J.S.A. 10:4-7). Our State's commitment to transparency in the conduct of governmental affairs has deep roots. As noted by Justice Pashman in Polillo v. Deane, 74 N.J. 562, 570 (1977), "[a]lthough state legislation in this area has proliferated only in the last decade, the common law origins of this important policy may be traced to English law dating back to the first half of the 18th century." We are thus bound to construe the provisions of the OPMA "liberally . . . in order to accomplish

its purpose and the public policy of this State[.]" N.J.S.A. 10:4-21.

The Board is a "public body" as defined in N.J.S.A. 10:4-8(a). As such, absent the existence of two specifically codified exceptions[5] that are not relevant here, the Board is not permitted to meet to conduct official business without having provided "adequate notice" to the public. N.J.S.A. 10:4-9(a). The OPMA provides two separate, yet related, means for public bodies to provide the notice required by N.J.S.A. 10:4-9(a). Read in pari materia with the requirements of N.J.S.A. 10:4-8(d), N.J.S.A. 10:4-18 requires the Board to publish, "[a]t least once each year," notice giving the time, date, location and, to the extent known, the agenda of any Board meetings scheduled for that year. This annual notice must be published in "at least two newspapers . . . designated by the public body to receive such notices[.]" N.J.S.A. 10:4-8(d). The two newspapers designated by the Board must have "the greatest likelihood of informing the public[.]" Ibid.

Here, the Board admitted before the Law Division that in October 2013, the Board's Secretary/School Administrator

_____

[5] The two exceptions permitting a public body to meet without having provided "adequate notice" are codified in N.J.S.A. 10:4-9(b) and N.J.S.A. 10:4-12(b). See McGovern, supra, 211 N.J. at 101.

discovered the annual notice of the Board's meetings for the school year 2013-2014 had been published in only one newspaper. The Secretary/School Administrator certified that the Board elected "to voluntarily publish agendas for each meeting, which set forth, to the extent known, the order of business of the upcoming meeting. These agendas are published within forty-eight (48) hours of the meeting."

Although the Board decided to also post its agenda on its official website, it had no obligation under the OPMA to do so. The OPMA does not require public bodies to post on its public website, no later than forty-eight (48) hours before all meetings, the full agenda for such meetings. N.J.S.A. 10:4-9.1, which was adopted by the Legislature effective November 4, 2002, provides:

> In addition to the notice requirements of the "Open Public Meetings Act," P.L. 1975, c. 231 (C. 10:4-6 et seq.), a public body may provide electronic notice of any meeting of the public body through the Internet.
>
> As used in this section, "electronic notice" means advance notice available to the public via electronic transmission of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting, which notice shall accurately state whether formal action may or may not be taken at such meeting.
>
> As used in this section, "Internet" means the international computer network of both

A-2520-13T3

> federal and non-federal interoperable packet switched data networks.
>
> [N.J.S.A. 10:4-9.1 (emphasis added).]

Thus, as N.J.S.A. 10:4-9.2 makes clear, "no electronic notice issued pursuant to this act shall be deemed to substitute for, or be considered in lieu of, [the] adequate notice [in N.J.S.A. 10:4-8(d)]." See also McGovern, supra, 211 N.J. at 100-01.

With this statutory framework as backdrop, we now turn to the discrete issue before us - what the meaning of "agenda" is in the context of the "adequate notice" requirement in N.J.S.A. 10:4-8(d). As we have shown, the legislative history of the OPMA includes comments exalting the laudable goals of the drafters of this landmark legislation and the democratic values they hoped to promote by its passage. The record also shows the executive branch was equally committed to taking public bodies out of the shadows and compelling them to conduct the public's business in the "sunshine."

On October 21, 1975, Governor Brendan Byrne declared he expected the statute would "significantly alter the process of government in New Jersey . . . [a] process [that] has long demanded alteration." The Governor noted the OPMA "is based on the fundamental premise that government should be open to public scrutiny, and accountable to the public it serves."

The final version of this legislation contains a clear declaration of public policy favoring transparency in the conduct of public bodies and encouraging citizen participation in the democratic process. The following relevant section of this declaration illustrates the point:

> The Legislature finds and declares that <u>the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies</u>, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society, and hereby declares it to be the public policy of this State <u>to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies</u> at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.
>
> The Legislature further declares it to be the public policy of this State to insure that the aforesaid rights are implemented pursuant to the provisions of this act so that no confusion, misconstructions or misinterpretations may thwart the purposes hereof.
>
> [<u>N.J.S.A.</u> 10:4-7 (emphasis added).]

Governor Byrne made transparency of governmental affairs a central part of his official statement:

> On balance, I believe that the idea of open government deserves a chance in New Jersey. The public's business can and should be carried out in public. Public agencies exist for the public's convenience, not their own. I have always pledged myself to that goal. This bill will be critical in achieving that objective. It establishes in the statute books the public's right to know how, why and by whom the public trust in public bodies is effectuated in governmental decisions.

Competing for legislative attention alongside these high ideals were also the concerns expressed by those who would be directly affected by the legal and practical obligations imposed by this statute. Governor Byrne articulated one of these concerns in the following prescient question: "Will the courts find it impossible to apply definitions of essential terms in particular contexts?" Although the question before us does not present us with an "impossible" task, it is, at the very least, a daunting one. We are asked to construe forty-year-old statutory terms rooted in the concept that notice requires some form of paper publication, in the context of our modern electronic age, where hand-held wireless devices are as ubiquitous and seemingly indispensable as newspapers were in 1975.

Specifically, we are asked to construe the term "agenda" as used in N.J.S.A. 10:4-8(d). It seems clear to us that the drafters of the OPMA wanted to compel public bodies in this State to conduct the public's business in the light of day, hence its unofficial moniker, "the Sunshine Law." The OPMA protects the right of the public "to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies." N.J.S.A. 10:4-7. Toward that end, the OPMA obligates public bodies to provide "written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting[.]" N.J.S.A. 10:4-8(d) (emphasis added).

The OPMA does not define the term "agenda." The Law Division construed the term "agenda" to include the attachments and supplemental documents mentioned therein principally because the Board has been unable to articulate any persuasive reasoning why the attachments should not be posted with the agendas prior to Board meetings. Once the Board undertook the voluntary step of posting the agenda on its website, the Law Division found no practical reason to withhold the supplemental materials mentioned therein. Under this line of reasoning, the Law

Division filled this void of statutory authority by judicial fiat.

The provisions in the OPMA that define "adequate notice" are tethered to a world where daily newspapers were presumed to be the most reliable and efficacious means of providing the public with notice of "the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting[.]" N.J.S.A. 10:4-8(d). In construing the term "agenda" in our modern technological age, it is tempting to define "agenda" to include attachments, appendices, and other forms of supplemental material because, practically, it merely requires adding an electronic "link" to the Board's agenda, which is already posted on its official website. Considering the public policy goals of the statute, it is nearly impossible to imagine this approach would have been rejected by Assemblyman Baer if it had been available in 1975.

However, our role as judges in our tripartite system of government is to construe statutes by using well-settled principles of legislative interpretation, not to amend statutes using our own notion of what is in the public's best interest. Our Supreme Court has recently reaffirmed what this approach entails:

> In statutory interpretation, a court's role is to determine and effectuate the

Legislature's intent. The first step toward that end is to consider the plain language of the statute. Statutory language should be given its ordinary meaning and be construed in a common-sense manner. Further, when construing the Legislature's words, every effort should be made to avoid rendering any part of the statute superfluous.

In sum, our overriding goal is to discern and effectuate the legislative intent underlying the statutory provision at issue. Our role is not to rewrite a plainly-written enactment of the Legislature []or [to] presume that the Legislature intended something other than that expressed by way of the plain language. Where the language is unclear or ambiguous, or if the Legislature's intention is otherwise uncertain, resort may be had to extrinsic aids to assist us in our understanding of the Legislature's will.

[State in the Interest of K.O., 217 N.J. 83, 91-92 (2014) (alteration in original) (citations omitted) (internal quotation marks omitted).]

Applying these principles of statutory construction, we construe "agenda" by giving it its plain, ordinary meaning: "a list or outline of things to be considered or done."[6]   The "adequate notice" requirement in N.J.S.A. 10:4-8(d), including the reference to "agenda," has not been amended since the OPMA was adopted in 1975. Although Advisory Opinions issued by

---

[6] Merriam-Webster, Full Definition of Agenda, http://www.merriam-webster.com/dictionary/agenda (last visited Aug. 9, 2015).

Attorneys General are not binding on the judiciary, a formal opinion of the Attorney General on an issue of law is binding on State agencies. See In re Town of Harrison, 440 N.J. Super. 268, 298-99 (App. Div. 2015) (citing Gladden v. Bd. of Trs. of the PERS, 171 N.J. Super. 363 (App. Div. 1979)).

The Attorney General's Advisory Opinion No. 19-1976 was issued shortly after the Legislature adopted the OPMA and has guided public bodies on the meaning of "agenda," as used in N.J.S.A. 10:4-8(d), for nearly forty years. The approach the Attorney General used to construe the term "agenda" in Advisory Opinion No. 19-1976 tracks the methodology for statutory construction our Supreme Court reaffirmed in K.O. We discern no rational or legal basis to deviate from the definition of "agenda" the Attorney General endorsed in Advisory Opinion No. 19-1976.

Furthermore, by enjoining the Board to post attachments in an agenda unless it "has a good faith belief that such documents are subject to an enumerated privilege, exemption, or the like" under OPRA, the OPMA, or the common law right of access, the Law Division improperly conflated three legally distinct sources of authority. Although all three promote a public policy of transparency in governmental affairs, they each serve a

different purpose and have different and independent procedural and substantive standards for obtaining judicial relief.

The OPMA is intended to insure the right of citizens "to have adequate advance notice of and the right to attend all meetings of public bodies[.]" N.J.S.A. 10:4-7. "The Legislature adopted OPRA to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." O'Boyle v. Borough of Longport, 218 N.J. 168, 184 (2014) (citations omitted) (internal quotation marks omitted). The common law right of access is an independent source of legal authority for the public to gain access to public records and defines "a public record" more broadly than the definition of "government record" contained in OPRA. Bergen Cnty. Improvement Auth. v. N. Jersey Media Grp., Inc., 370 N.J. Super. 504, 509-10 (App. Div.), certif. denied, 182 N.J. 143 (2004).

We conclude our analysis by noting that changes in the law often do not occur parallel with technological or scientific advancements. In 2002, the Legislature adopted N.J.S.A. 10:4-9.1, giving public bodies the option to "provide electronic notice of any meeting of the public body through the Internet[,]" but only as an addition to the traditional newspaper notice required by N.J.S.A. 10:4-8(d), not as a

substitute.  See N.J.S.A. 10:4-9.2.  With the exception of this notable "internet"-related amendment, the OPMA remains firmly rooted in 1975.

The information technology revolution has transformed our lives in profound and irrevocable ways since the adoption of the OPMA over forty years ago.  Thus, there may be no technologically sound reason to disagree with the facially sensible approach adopted by the Law Division here.  However, "[t]he wisdom of a statute is not for the courts."  Harrison, supra, 440 N.J. Super. at 301 (quoting Dacunzo v. Edgye, 19 N.J. 443, 454 (1955)).  As Justice LaVecchia recently reminded us writing on behalf of a unanimous Supreme Court, "[i]t is not our job to engraft requirements [on a statute] that the Legislature did not include.  It is our role to enforce the legislative intent as expressed through the words used by the Legislature." Lippman v. Ethicon, Inc., ____ N.J. ____, ____ (2015) (slip op. at 46-47).

We thus respectfully suggest that the other branches of our tripartite system of government heed Governor Byrne's admonition included in his statement endorsing the passage of the OPMA in 1975: "The Legislature should systematically monitor the experience of government at all levels in living with this new law and analyze the need for amendment on the basis of that

experience."  In the meantime, our duty is to uphold the OPMA in its current form.

     Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2520-13T3